**T.J. HAYES, Appellant,**

v.

**A.L. LOCKHART, Director, Arkansas Department of Corrections, Appellee.**

**No. 86–1690.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1987.

Decided July 22, 1988.

Jeff Rosenzweig, Little Rock, Ark., for appellant.

Jack Gillean, Asst. Atty. Gen., Little Rock, Ark., for appellee.

Before ROSS[*] and WOLLMAN, Circuit Judges, BRIGHT, Senior Circuit Judge.

WOLLMAN, Circuit Judge.

Appellant, T.J. Hayes, was found guilty by a jury of capital felony murder, Ark. Stat.Ann. § 41–1501 (Repl.1977). The jury recommended a sentence of death by electrocution. The conviction was reversed by the Arkansas Supreme Court, and a new trial was ordered on the ground that the trial court should have allowed defense counsel access to records of Hayes' court-ordered psychiatric and psychological examinations. *Hayes v. State*, 274 Ark. 440, 625 S.W.2d 498 (1981). Hayes was retried and again was found guilty of capital murder and sentenced to death. The Arkansas Supreme Court upheld the conviction and death sentence, *Hayes v. State*, 278 Ark. 211, 645 S.W.2d 662, *cert. denied*, 464 U.S. 865, 104 S.Ct. 198, 78 L.Ed.2d 173 (1983), and subsequently denied his petition for a stay of execution and for post-conviction relief. *Hayes v. State*, 280 Ark. 509, 660 S.W.2d 648 (1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984).

Hayes then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Arkansas. After an evidentiary hearing, the district court[1] held that Hayes' petition should be denied. We affirm.

At about 2:30 on the afternoon of July 16, 1979, Hayes and his girlfriend, Catherine Carter, both black, departed from Ms. Carter's parents' home in a Yellow Cab, bearing the number 11, driven by J.W. Lunsford, a white male. A security guard for the Arkansas Department of Corrections noticed Yellow Cab number 11, driven by a white male and carrying two black passengers, one male and one female, in the backseat, proceeding slowly around a curve on Princeton Pike that afternoon. Approximately one hour later, this witness observed Yellow Cab number 11, this time occupied only by the driver, the black male the witness had earlier seen in the backseat of the cab, returning from the direction it had earlier proceeded on Princeton Pike. The witness made an in-court identification of Hayes as the driver on the return trip.

At about 4:15 on the afternoon of July 16, 1979, Hayes walked into the local county jail and stated that he thought he had just killed his girlfriend. Hayes then led two officers to the place where the bodies were located and to the place where he had hidden the cab. At about 7:30 that evening, after being informed once again of his *Miranda* rights, Hayes signed a waiver form and made a statement to the officers. Hayes told the officers that he had directed the cabdriver to drive to a location on Princeton Pike. Once there, Hayes and Ms. Carter got out of the cab. Hayes then brandished a revolver and told Lunsford to go back to town. Lunsford, however, advanced toward Hayes in an apparent attempt to disarm him. Hayes then shot

---

[*] The Honorable Donald R. Ross was an active judge of the Eighth Circuit on the date this case was submitted, but took senior status on June 13, 1987, before the decision was filed.

1. The Honorable Garnett Thomas Eisele, Chief Judge, United States District Court for the Eastern District of Arkansas.

Lunsford twice, killing him. The first shot struck Lunsford in the temple; the second entered behind his left ear. Hayes then broke a window in an abandoned house on the property. He and Ms. Carter then entered the house. Inside, Ms. Carter told Hayes that she would not be going out with him anymore because she had found someone else that she was interested in, whereupon Hayes shot Ms. Carter twice, killing her.[2] After first attempting to burn Ms. Carter's body by setting fire to her clothing and a window curtain, Hayes then left the scene in the cab, which he later hid in a wooded area.

## I.

Hayes' arrest for the two murders on July 16, 1979, triggered the speedy trial provisions of Ark.R.Crim.P. 28.1(b) and 28.-2(a) (Repl.1977).[3] At the time of Hayes' arrest, Rule 28.1(b) provided:

> Any defendant charged with an offense in circuit court and held to bail, or otherwise lawfully set at liberty, shall be brought to trial before the end of the third full term of court from the time provided in Rule 28.2, excluding only such periods of necessary delay as are authorized in Rule 28.3.

Rule 28.2(a) provides:

> The time for trial shall commence running, without demand by the defendant, from the following dates:
>
> (a) from the date the charge is filed, except that if prior to that time the defendant has been continuously held in custody or on bail or lawfully at liberty to answer for the same offense or an offense based on the same conduct or arising from the same criminal episode,

then the time for trial shall commence running from the date of arrest.

Rule 28.1 was known as the "terms of court" rule. According to Rule 28.1(a), defendants not incarcerated pending trial were to be tried within three terms of court, excluding periods of necessary delay and the term in which the arrest occurred.[4] See Matthews v. State, 268 Ark. 484, 598 S.W.2d 58 (1980). Incarcerated persons were subject to a special shorter two terms of court rule. See Ark.R.Crim.P. 28.1(a) (Repl.1977). Under Rule 28.2(a), the time for trial began running for Hayes at the time of his arrest.

On July 1, 1980, while Hayes was awaiting trial, new speedy trial rules promulgated by the Arkansas Supreme Court took effect. These rules changed the method of calculation from terms of court to months—eighteen months normally, and twelve months for persons incarcerated in the penitentiary. See Ark.R.Crim.P. 28.1. The provision relevant to this case reads as follows:

> Any defendant charged with an offense in circuit court and incarcerated in prison in this state pursuant to conviction of another offense shall be entitled to have the charge dismissed with an absolute bar to prosecution if not brought to trial within twelve (12) months from the time provided in Rule 28.2, excluding only such periods of necessary delay as are authorized in Rule 28.3.

Ark.R.Crim.P. 28.1(b). The period of time from Hayes' arrest to the time of his trial amounted to approximately eighteen months and three weeks. There were between three to five months of excluded periods. Consequently, Hayes was tried within the time allotted under the "terms

---

**2.** The first shot, fired from a distance of at least three feet, entered Ms. Carter's lower left jaw, passed through the mouth, and exited from the right jaw. The second shot was fired from a distance of from six inches to one foot into Ms. Carter's forehead, almost between her eyes.

**3.** After his arrest, Hayes was returned to the Arkansas Department of Correction as a parole violator, having been released on supervised parole on October 13, 1978, after serving some six years of a twenty-one year sentence on a 1972 second degree murder conviction.

**4.** Under the "terms of court" approach, Rule 28.1(b) would be applicable to Hayes despite the fact that he was incarcerated after his arrest. The Arkansas Supreme Court in Matthews v. State, 268 Ark. 484, 488, 598 S.W.2d 58, 61 (1980), held that Rule 28.1(b), prior to its amendment, was applicable to defendants incarcerated at the Arkansas Department of Correction on an unrelated charge while awaiting trial. As indicated earlier, Hayes was incarcerated after his arrest because he had violated his parole.

of court" approach, but not within the time required under the speedy trial rules.

When the new rules were promulgated, Arkansas Supreme Court stated in a per curiam order:

> The time for trial of all defendants that has commenced to run pursuant to Rule 28.2 prior to July 1, 1980, shall continue to be governed by Article VIII as it existed prior to this amendment, but the time for trial of all defendants that commences to run pursuant to Rule 28.2 (not changed by this amendment) on July 1, 1980, or thereafter, shall be governed by this amendment of Article VIII * * *.

*In re Rules of Criminal Procedure,* 269 Ark. 988 (1980) (per curiam). Judging by the plain language of the order, it seems clear that the new speedy trial rules were intended to be inapplicable to defendants such as Hayes, whose time for trial had already begun to run.

Hayes argues, however, that the Arkansas Supreme Court's subsequent decision in *Jennings v. State,* 276 Ark. 217, 633 S.W. 2d 373, *cert. denied,* 459 U.S. 862, 103 S.Ct. 137, 74 L.Ed.2d 117 (1982), stands for the proposition that the new rules are to be applied to all trials occurring after July 1, 1980. Hayes contends that the failure of the Arkansas courts to apply the so-called plain language of *Jennings* to his case was a violation of his rights of due process and equal protection. We do not agree.

■ It is true that the court in *Jennings* stated that the speedy trial rules could "be validly applied to all criminal trials commencing on or after July 1, 1980." 633 S.W.2d at 374. Reading this language out of context, it might appear that the Arkansas Supreme Court actually meant to say that the new speedy trial rules should apply to defendants whose first trial was held after July 1, 1980. There was no mention in *Jennings,* however, that the Arkansas Supreme Court intended to overrule its per curiam order, and we see no reason why the *Jennings* case should be interpreted as if it did. The narrow holding of *Jennings* is that the new speedy trial rules are to be applied to all criminal trials in which the arrest occurred on or after July 1, 1980. Common sense dictates that the *Jennings* case should be read to stand for that proposition, and not for the broad holding that Hayes suggests. We conclude, therefore, that the application of the term of courts rule to Hayes instead of the new speedy trial rules was not a violation of Hayes' due process or equal protection rights.

## II.

■ Hayes contends that he was denied his due process rights during the penalty phase of his trial when the jury imposed the death sentence based upon a finding of a single aggravating circumstance. He argues that the statute, Ark.Stat.Ann. § 41–1302 (Repl.1977), requires proof of more than one aggravating circumstance.[5] Though the statute refers to "aggravating circumstances," the Arkansas Supreme Court held in Hayes' post-conviction relief appeal that the statute "requires only that the jury unanimously find at least one of the aggravating circumstances set forth in § 41–1302 to exist before it can impose the death penalty." *Hayes v. State,* 280 Ark. at 5094, 660 S.W.2d at 654. The court

---

5. Ark.Stat.Ann. § 41–1302 (Repl.1977) provides:

41–1302. Findings required for death sentence—Unanimity required.

—(1) The jury shall impose a sentence of death if it unanimously returns written findings that:

    (a) aggravating circumstances exist beyond a reasonable doubt; and

    (b) aggravating circumstances outweight [outweigh] beyond a reasonable doubt all mitigating circumstances found to exist; and

    (c) aggravating circumstances justify a sentence of death beyond a reasonable doubt.

(2) The jury shall impose a sentence of life imprisonment without parole if it finds that:

    (a) aggravating circumstances do not exist beyond a reasonable doubt; or

    (b) aggravating circumstances do not outweight [outweigh] beyond a reasonable doubt all mitigating circumstances found to exist; or

    (c) aggravating circumstances do not justify a sentence of death beyond a reasonable doubt.

(3) If the jury does not make all findings required by subsection (1), the court shall impose a sentence of life imprisonment without parole.

based its determination on Ark.Stat.Ann. § 1–201 (Repl.1977), which states that "[w]henever, in any statute, words importing the plural number are used in describing or referring to any matter, parties or persons, any single matter, party or person shall be deemed to be included, although distributive words may not be used." The interpretation of state law is a matter for the state courts, and there is nothing in the Arkansas Supreme Court's ruling on this issue that gives rise to a due process violation.

## III.

■■■ Hayes contends that he was penalized for exercising his right to trial and for his inability to consummate an intended plea of guilty. Prior to trial, the prosecution had offered on at least two occasions to permit a sentence of life without parole in return for a plea of guilty. No agreement was ever consummated. Hayes now argues that because the prosecution sought the death penalty at trial after a previous offer of life without parole, he was penalized for exercising his right to trial. We see no reason, however, why the prosecution cannot seek a higher sentence if a plea offer is not accepted—no matter whether the punishment ultimately sought is the death penalty or some lesser sentence. *Cf. Ricketts v. Adamson,* — U.S. —, 107 S.Ct. 2680, 2685–87, 97 L.Ed.2d 1 (1987) (state not foreclosed from reinstating first-degree murder charge after defendant failed to fulfill plea bargain resulting in second-degree murder charge).

Hayes also submits that he was penalized for his inability to consummate a guilty plea. He appears to suggest that the trial judge should have done more to ensure that the plea agreement was consummated. As we read the record, however, the trial court stood ready to accept Hayes' guilty plea. It was only after Hayes manifested ambivalence about pleading guilty that the trial judge stated that he would not accept a guilty plea that was less than voluntarily tendered and suggested to Hayes that he might want to reconsider his decision to forego a jury trial. Hayes has not established that his decision to proceed to trial was not voluntarily made.

## IV.

Hayes alleges that the district court erred in failing to grant him a new trial or, alternatively, a new sentencing hearing as a result of his trial counsel's ineffective performance at various stages of the trial.

The test for determining effective assistance of counsel is set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), where the Court stated that "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686, 104 S.Ct. at 2064. More specifically, the Court stated that in order to establish ineffectiveness of counsel, a defendant must prove two things. First, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. Second, the defendant must also establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068.

### A.

■■■ Hayes first contends that his attorney was ineffective for not requesting a jury instruction on voluntary intoxication as a defense. He asserts that such an instruction would have been appropriate in light of the evidence presented at trial and in view of *Varnedare v. State,* 264 Ark. 596, 573 S.W.2d 57 (1978), which recognizes self-induced intoxication as a defense if it causes the defendant to be incapable of forming the intent necessary for the crime.[6]

---

6. *Varnedare* has been overruled by the Arkansas Supreme Court. *See White v. State,* 290 Ark. 130, 717 S.W.2d 784 (1986).

We review this claim of alleged ineffectiveness in the light of the fact that the evidence of Hayes' intoxication on the day in question was minimal at best. Hayes told the police that he had been drinking all day, having started drinking at 8:30 on the morning of July 16. The only evidence to support this statement was the testimony of Hayes' sister, who testified that she had seen Hayes drinking a bottle of Champale at about 1:30 on the afternoon of July 16. Ms. Carter's parents, however, testified that Hayes did not appear to be intoxicated when he left their home with Ms. Carter in the cab that afternoon. Indeed, they both testified that they detected no odor of alcohol on his breath. One of Hayes' cousins testified that Hayes did not appear to be intoxicated when she saw him at his parents' home during the lunch hour on July 16. The several officers who questioned Hayes and accompanied him to the scene of the killings all testified that they detected no odor of alcohol on Hayes' breath and that he did not appear to be intoxicated. Hayes' slowness in responding to questioning did prompt one of the officers to ask him if he had been drinking, but other than Hayes' affirmative answer to that question there was no outward manifestation by way of odor of alcohol, slurred speech, or staggering gait to so indicate. In a word, then, there was minimal evidence to support the giving of a voluntary intoxication instruction.

Although defense counsel did not offer or request a specific instruction on the defense of voluntary intoxication, the issue of voluntary intoxication was in fact presented to the jury. Hayes' attorney presented evidence on the issue of Hayes' state of mind on the day of the crime (including evidence of Hayes' alleged intoxication); and in his closing argument he argued the issue of Hayes' intoxication and state of confusion. As the district court recognized, trial counsel argued voluntary intoxication as fully as if the instruction had been given. Furthermore, the jury instructions that were given on specific intent, premeditation, and the State's burden of proof did not in any way negate the legitimacy of counsel's argument. Instead, such instructions made his argument both relevant and proper. We therefore find that Hayes has failed to show that there is a reasonable probability that the outcome would have been different if a specific instruction on voluntary intoxication had been given.

### B.

■ Hayes asserts that he was denied the effective assistance of counsel during jury voir dire in that his trial counsel (1) should have made a motion for sequestered voir dire, (2) should have engaged in more extensive questioning of the prospective jurors after his peremptory challenges had been exhausted, and (3) should have objected when a prospective juror announced in the presence of the other prospective jurors that he had been a spectator at Hayes' first trial. We agree with the district court, however, that defense counsel's handling of the voir dire represented an exercise of judgment that did not constitute ineffective assistance of counsel and that Hayes has not established that he suffered any prejudice as a result of counsel's performance during voir dire.

### C.

■ Hayes also alleges that his counsel was ineffective for failing to object in all but one instance to certain remarks made by the prosecuting attorney during opening and closing arguments at the guilt and penalty phases of the trial. Hayes points to several instances where the prosecution made references as to the character and situation of the victims. In his opening remarks, the prosecutor referred to the victims by stating:

Their voices won't be heard with the exception of the fact that Mr. Robinson and I will be presenting our case, and hopefully their voices will be heard through our witnesses. But in the final analysis you will be their voices.

He went on to state:

There is just one other point that I want to bring up. A lot of times in the summer time there is an awfully pretty sun-

set, awfully pretty. These two people never saw it, they never saw it and never will.

In closing argument in the guilt phase, the prosecutor referred to the victims as follows:

That was Mr. Lunsford's first day on the job. Brand new. First day on the job trying to support his family, and it ends so abruptly and horribly for him. First day on the job, and look what happens.

Catherine Carter, who spent three years at the Pine Bluff Nursing Home, helping people, caring about people, loving, supporting them. And she gets a better job and she moves up to help her mother and her father and her 14-year-old son who is going to graduate from high school next year who doesn't have a mother now and hasn't had in two and a half years—almost three years. She gets that better job and been [sic] working there months, and look how it ends for her.

In his closing argument at the guilt phase, addressing certain of the jurors by name, the prosecutor stated:

Put yourself in [Catherine Carter's] shoes. Think about it when you get in the jury room. Think about it Mrs. Scott, you've got four children. [Catherine Carter's mother]—she only has four children. Her baby daughter is gone. Think about it Mrs. Burns when you get back in the jury room of the pain that [Catherine Carter] must have felt and the agony and the terror and the horror because she's got blood over her; she's partially clothed—all of her clothing comes off. She's humiliated standing in front of this man that she thought cared about her and she probably cared about, and she's bleeding all over the place.

Also during closing argument at the guilt phase, the prosecutor at one point turned from the lectern and pointed at Hayes. Hayes then spontaneously exclaimed, "Get your finger out of my face." The prosecutor in turn referred to that exclamation as an example of Hayes' violent tendencies. Hayes' attorney objected, but obtained no ruling from the court and chose not to pursue the matter further.

During his rebuttal argument at the penalty phase, the prosecutor made references to portions of the Bible that suggested the propriety of putting a person to death for killing another, this in apparent response to that portion of defense counsel's argument in which he quoted the "Forgive us our trespasses" language of the Lord's Prayer.

Although we do not condone the prosecutor's remarks, we nevertheless conclude that the failure of Hayes' trial counsel to object to these arguments did not constitute ineffective assistance of counsel under the *Strickland* standard. At the hearing below, Hayes' trial counsel testified that he had made a considered decision not to object during the prosecutor's opening and closing remarks in the hope that by doing so he could establish some sort of relationship with the jury. Counsel believed that any objection in open court during argument might have prejudiced the jury against both his client and himself. We agree with the district court that this was not an unreasonable decision on counsel's part. We also conclude that Hayes has not demonstrated that there is a reasonable probability that, but for counsel's failure to object to these remarks, the result of the guilt or penalty phases of the proceeding would have been different.

■ Hayes also contends that the prosecutor's remarks were manipulative and therefore constituted reversible error under the Court's reasoning in *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). In *Darden*, the Court stated that "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* 106 S.Ct. at 2472 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)). Our review of the record reveals that there was no manipulation or misstatement of the evidence by the prosecution, nor did the statements "implicate other specific rights of the accused such as the right to counsel or the right to remain

silent." *Id.* Moreover, the prosecutor's remarks were not such that they tended to diminish the jury's view of their responsibility at trial, as occurred in *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Finally, the jury was instructed by the trial court that the opening and closing remarks were not to be considered as evidence, and the overwhelming nature of the evidence at the guilt phase "reduced the likelihood that the jury's decision was influenced by argument." *Darden,* 106 S.Ct. at 2472–73. Consequently, we cannot say that the prosecutor's statements infected the trial with such a degree of unfairness as to result in a denial of due process.

In reaching our decision on this issue, we have considered the Supreme Court's recent decision in *Booth v. Maryland,* —— U.S. ——, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). There, the Court held unconstitutional a state statute that required that the jury be informed of the effect the killing has had on the victim's family—a so-called victim impact statement—either by means of in-court testimony from family members or by reading to the jury the victim impact statement. In Booth's case, the latter procedure was followed. The Court held that the impact the killing has had on the victim's family is not a proper sentencing consideration in a capital case.

> [T]he formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant. * * * The admission of these emotionally-charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decisionmaking we require in capital cases.

*Id.* 107 S.Ct. at 2536 (footnote omitted).

We conclude that the holding in *Booth* does not require a reversal in the present case. Here, the prosecutor's comments did not constitute a state-sanctioned submission of victim impact testimony as a part of the state's case. As stated above, the jury was instructed that the arguments of coun-

sel did not constitute evidence. Thus the consideration that formed the basis of the Court's holding in *Booth*—the state-imposed requirement that the jury consider the impact of the crime on the victim's family—was absent. Beyond that fundamental distinction between *Booth* and this case, we note that however objectionable the prosecutor's references may have been, they did not approach in length or detail the victim impact statement in *Booth. See id.* 107 S.Ct. at 2536 (Appendix to Opinion of the Court).

Accordingly, we hold that Booth does not mandate reversal of Hayes' conviction on the basis of the prosecutor's references to the suffering and loss experienced by the victims and their families as a result of the killings.

## D.

■ Hayes contends that this court's decision in *Woodard v. Sargent,* 806 F.2d 153 (8th Cir.1986), requires reversal of his death sentence based upon counsel's failure to introduce mitigation evidence. We do not agree.

In *Woodard,* defense counsel failed to request a jury instruction on the newly-enacted statutory mitigating circumstance of lack of a prior history of significant criminal activity and failed to insure that the checklist of aggravating and mitigating circumstances submitted to the jury included this factor as a possible mitigating circumstance. *Id.* at 157. The court concluded that counsel's failure to seek the inclusion of this mitigating circumstance fell below the threshold of reasonably competent assistance inasmuch as finding of a mitigating circumstance should have been an important objective in Woodard's case. *Id.* Because the court was unable to conceive of any possible tactical reason for counsel's failure to make the request, the death sentence was set aside as constitutionally invalid. *Id.*

We conclude that *Woodard* is inapplicable to the facts before us. First, the checklist that was submitted to the jury included the following mitigating circumstances:

1. The capital murder was committed while T.J. Hayes was under extreme mental or emotional disturbance.

\*    \*    \*    \*    \*    \* ·

3. The capital murder was committed while the capacity of T.J. Hayes to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect, intoxication or drug abuse.

In his argument to the jury in the penalty phase, defense counsel referred to the testimony the jury had heard regarding Hayes' treatment for alcoholism and asked that the jury consider this as a mitigating circumstance, specifically referring to paragraph three of the checklist set forth above.

Second, as set forth below, we agree with the trial court that defense counsel made a reasonable decision in concluding that the introduction of the medical and psychological reports that Hayes contends constituted mitigating evidence would have harmed Hayes more than they would have helped him.

1.

At the outset of the penalty phase of the trial, the state introduced certified copies of judgments of conviction showing that on October 6, 1972, Hayes had pleaded guilty to three felony charges: two charges of Shooting At With Intent To Kill Or Wound, and one charge of Second Degree Murder (reduced from First Degree Murder). The state then rested.

When asked by the trial court whether he wished to present evidence of mitigating circumstances, defense counsel replied in the affirmative and attempted to call Hayes' sister to the stand, whereupon there was a pause in the proceedings while defense counsel conferred with Hayes at counsel table. Defense counsel then stated that he did not wish the witness to testify. There then followed an in-chambers conference at which the following record was made:

[DEFENSE COUNSEL]: For the record, during the aggravating and mitigating phase of the trial I did attempt to call the defendant's sister, Rebertha Hilton, to the stand to testify, and the defendant requested that I not do so there in open Court.

THE COURT: The Court will confirm that as a fact. As a matter of fact the witness was called and did take the stand, and the defendant very forcefully demanded that she be not permitted to testify.

Upon returning to the courtroom, defense counsel stated that he had no other evidence of mitigating circumstances that he wished to present.

We conclude that defense counsel should not be faulted for honoring Hayes' desire that his sister not be called to testify at the penalty phase. Defense counsel testified at the habeas corpus hearing that Hayes had made known to him prior to trial that he did not want any family members called to testify on his behalf. As indicated above, Hayes forcefully renewed this wish when his sister was called to the stand at the penalty phase. Defense counsel testified that he believed that Hayes was competent to make this decision. Indeed, counsel mentioned on more than one occasion during the hearing that Hayes had been a very difficult, demanding, authoritative client, one who had told counsel what he wanted done on his behalf.

2.

Defense counsel called two staff members of the Southeast Arkansas Mental Health Center at the guilt phase of the trial. One of these witnesses testified that Hayes had been referred for counseling by his probation officer in October of 1978 and that Hayes continued some individual counseling for alcohol abuse from October 16, 1978, to May 10, 1979. The other witness, Dr. William James, medical director at the Southeast Arkansas Mental Health Center, testified that he had had a brief interview with Hayes on May 30, 1979, following Hayes' complaints of anxiety and insomnia. Hayes related to Dr. James that he had been experiencing a good deal of nervousness since breaking up with his girlfriend

several days earlier. He also told Dr. Hayes that he had been worried about his elderly parents' intellectual deterioration over the past several months. Hayes also stated that he had been having suicidal thoughts. Dr. James prescribed an antidepressant for Hayes after Hayes stated that he had not had a drink of alcohol in seven years. Hayes did not return for the follow-up appointment that Dr. James had scheduled with him for June 30, 1979.

Following Dr. James' testimony, defense counsel introduced as a joint exhibit a letter from a psychiatrist on the staff of the state Division of Mental Health Services containing the following diagnosis of Hayes' physical and mental state: (1) without psychosis, (2) alcohol addiction, and (3) antisocial personality, severe.

The medical and psychological reports available to defense counsel included a psychiatric evaluation by Dr. Gregory S. Krulin, a consulting psychiatrist at the Southeast Arkansas Mental Health Center. Dr. Krulin's report states, among other things, that Hayes had told him that on the day of the killings a man, whom Hayes refused to identify, had told Hayes that he, the unidentified man, had killed Ms. Carter and the cabdriver. The unidentified man told Hayes that he, Hayes, was "to take the rap" and that he should turn himself in to the police, and that if Hayes did not take the rap his mother would be killed. Dr. Krulin's report notes that Hayes had described his history of alcohol abuse. The report concludes with the notation that "[t]he patient also gives the history compatible with chronic alcohol abuse and adjustment reaction secondary to being in prison."

Other psychological reports in the record indicate that Hayes obtained a full scale IQ score of eighty-one on the Wechsler Adult Intelligence Scale, which falls within the dull-normal range of intellectual ability. One of the psychological evaluation reports states in part that:

> Personality testing suggests that Mr. Hayes is an impulsive individual who is capable of becoming aggressive. He seems easily upset; possibly with the slightest provocation. A low tolerance for frustration and stress may be exhibited in a history of aggressive behavior. Mr. Hayes' behavior may also reflect his limited social skills. Yet, he likes to feel he is a source of power and influence; someone to be contended with. He is likely to have trouble analyzing situations and may misinterpret others' intentions. He does not appear to empathize with people; being somewhat distant.

The psychological and medical reports also refer to an incident in which Hayes had shot a man while Hayes was attempting to shoot at his, Hayes', wife.

### 3.

Defense counsel's decision not to present as mitigating evidence Hayes' medical and psychological reports presents a troublesome issue. When viewed in the light of *Strickland v. Washington, Darden v. Wainwright,* and *Burger v. Kemp,* —— U.S. ——, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), counsel's decision not to submit those reports cannot be characterized as constituting ineffective assistance of counsel.

*Strickland* teaches us that

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. * * * A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged

action "might be considered sound trial strategy."

*Strickland v. Washington,* 466 U.S. at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)). The Court held that counsel's decision not to seek more character or psychological evidence than was already available to him and to rely solely upon the plea colloquy alone as mitigation evidence at the sentencing hearing represented the exercise of reasonable professional judgment.

In *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), as in the instant case, defense counsel presented no evidence in mitigation at the penalty phase of trial. After reviewing the considerations that prompted trial counsel to reasonably conclude that the previously considered mitigation evidence should not be offered, the Court, quoting the language from *Strickland* set forth above, concluded that the defendant had not overcome the presumption that counsels' decision might be considered sound trial strategy, and accordingly rejected the claim of ineffective assistance.

In *Burger v. Kemp,* —— U.S. ——, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), the Court reviewed defense counsel's decision not to present any evidence in mitigation at the sentencing phase of the defendant's trial. The evidence that the defendant contended should have been presented would have consisted of his own testimony, his mother's testimony regarding the defendant's exceptionally unhappy and unstable childhood, the testimony of a psychologist whom defense counsel had employed to assist him in preparation for trial, and the testimony of an Indiana lawyer who had acted as the defendant's "big brother" during the time that the defendant had lived in Indiana. The defendant was seventeen years old at the time of the crime. He had an IQ of eighty-two and was functioning at the level of a twelve year old. *Id.* 107 S.Ct. at 3118. He possibly had suffered brain damage from beatings when he was younger. *Id.* at 3138 (Powell, J., dissenting). Because the defendant expressed no remorse about the crime and because the psychologist indicated that the defendant might well have bragged about the killing on the witness stand, defense counsel concluded that the jury might regard the defendant's attitude on the witness stand as indifferent or worse. Likewise, after talking with the defendant's mother on several occasions, defense counsel concluded that her testimony would not be helpful and might indeed be counterproductive. Defense counsel decided not to call the Indiana lawyer as a witness after determining that information that the lawyer could have presented would not be helpful to the defendant.

Although the defendant presented several affidavits at the habeas corpus hearing that described the evidence that defense counsel might have presented regarding the defendant's troubled family background, the Court noted that that information could have adversely affected the jury by introducing facts not otherwise disclosed by the defendant's clean adult criminal record. These facts included references to the defendant's having been on juvenile probation and to his having become involved in drugs while living in Florida. More than that, the Court concluded, the affidavits suggested that the defendant had violent tendencies that were at odds with defense counsel's strategy of portraying his actions on the night of the murder as the result of a strong influence upon his will exerted by an older participant in the killing, whom defense counsel attempted to portray as the person primarily responsible for the decision to kill the victim.

Conceding that the record suggested that defense counsel could well have made a more thorough investigation than he did, the Court nevertheless held that the defendant had not established that counsel's acts or omissions were outside the wide range of professionally competent assistance, the standard laid down in *Strickland,* stating that:

[I]n considering claims of ineffective assistance of counsel, "[w]e address not what is prudent or appropriate, but only what is constitutionally compelled." We have decided that "strategic choices

made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Applying this standard, we agree with the courts below that counsel's decision not to mount an all-out investigation into petitioner's background in search of mitigating circumstances was supported by reasonable professional judgment. It appears that he did interview all potential witnesses who had been called to his attention and that there was a reasonable basis for his strategic decision that an explanation of petitioner's history would not have minimized the risk of the death penalty. Having made this judgment, he reasonably determined that he need not undertake further investigation to locate witnesses who would make statements about [the defendant's] past.

*Burger v. Kemp,* 107 S.Ct. at 3125–26 (citations omitted) (quoting *United States v. Cronic,* 466 U.S. 648, 665 n. 38, 104 S.Ct. 2039, 2050 n. 38, 80 L.Ed.2d 657 (1984) and *Strickland v. Washington,* 466 U.S. at 690–91, 104 S.Ct. at 2066)).

### 4.

We conclude that when measured against the test of effective assistance of counsel set forth in *Strickland, Darden,* and *Burger,* defense counsel's performance in the instant case was not deficient in a constitutional sense. Counsel was not derelict in his investigation of possible mitigating evidence, having made a thorough investigation into Hayes' contention that he was intoxicated on the day of the killings. Counsel testified that he had spoken to Hayes' previous defense lawyer, with Hayes himself, and with the persons who had seen Hayes prior to the killings, as well as to the officers who came into contact with Hayes following his appearance at the police station. In an attempt to locate other witnesses who might have been able to provide information on Hayes' alleged intoxication on the day of the killings, counsel attempted (unsuccessfully, as it turned out) to learn from Hayes the name of the liquor store at which he had purchased the liquor that he claimed to have drunk that day. As indicated above, counsel attempted to introduce testimony from Hayes' sister at the penalty phase, only to have that attempt thwarted by Hayes himself.

True, counsel did not recall at the penalty phase the two witnesses from the Southeast Arkansas Mental Health Center who testified at the guilt phase with respect to Hayes' treatment for alcohol abuse at that facility in 1978–79. Nonetheless, that evidence could only have been fresh in the minds of the jury, and defense counsel specifically urged the jury at the penalty trial to consider Hayes' history of alcohol abuse as a mitigating circumstance. In any event, as indicated earlier, the evidence that Hayes was intoxicated on the day of the killings was weak at best.

In response to the district court's question as to why he chose not to use Dr. Krulin's statement or the other medical and psychological information that was available to him, defense counsel replied:

> This report came to me as a package, and I felt I could not delete portions of it without offering all of it. And there were references to Mr. Hayes' violent past in this report. Also, there was a reference to a shooting just before Mr. Hayes came down to Pine Bluff, and my information was that Mr. Hayes had shot a woman in Seattle, Washington, who was now paralyzed. And the prosecutor was attempting to get me to agree to this by stipulation, and I did not feel—I just felt that the information in those reports were going to hurt Mr. Hayes more than they would have helped him.

> \* \* \* \* \* \*

> [T]here were references in the reports about his wife shooting—about Mr. Hayes' wife shooting Mr. Hayes, and also there was a reference to a shooting when Mr. Hayes is making a statement to some social worker or to a doctor, and so I chose not to offer it.

Defense counsel testified that he placed no credence in Hayes' statements to Dr. Krulin regarding the anonymous man who

claimed to have committed the murders and who told Hayes that he would have to take responsibility for the killings, an account characterized by the district court as a "cock and bull" story.

We hold that defense counsel's decision not to present any additional evidence in mitigation after his attempt to call Hayes' sister was thwarted constituted a reasonable trial tactic, one that was based upon counsel's calculated assessment that the risk of probable harm exceeded the possible benefit that might have resulted from the evidence that Hayes now claims should have been presented.

### Conclusion

As evidenced by its recapitulation of the evidence, the district court had carefully studied the record of Hayes' trial, including the medical and psychological reports. After listening to the in-court testimony of defense counsel and Hayes at the habeas corpus hearing, the district court found defense counsel's testimony credible and his explanation of his trial tactics plausible. To the extent that they constitute pure findings of fact, we cannot say that the district court's findings are clearly erroneous. To the extent that the district court's determination that defense counsel's performance was not constitutionally deficient represents a mixed finding of fact and law, our independent review of the record leads us to conclude that that determination should be affirmed.

In holding that defense counsel's representation was not constitutionally deficient, we are mindful that our function is not to insulate trial counsel's performance from post-trial review and criticism, especially in death penalty cases, for a lawyer's professional reputation is not to be preserved at the expense of a defendant's constitutional rights. At the same time, however, we must resist

> the temptation to second-guess a lawyer's trial strategy; the lawyer makes choices based on the law as it appears at the time, the facts as disclosed in the

proceedings to that point, and his best judgment as to the attitudes and sympathies of judge and jury. The fact that the choice made later proves to have been unsound does not require a finding of ineffectiveness. The petitioner bears the burden of successfully challenging particular acts and omissions of his attorney which were not the result of reasonable professional judgment; it is not enough to complain after the fact that he lost, when in fact the strategy at trial may have been reasonable in the face of an unfavorable case.

*Blackmon v. White*, 825 F.2d 1263, 1265 (8th Cir.1987).

We conclude, therefore, that Hayes has failed to demonstrate that his trial counsel rendered ineffective assistance within the meaning of the sixth amendment.

The district court's judgment dismissing the petition for a writ of habeas corpus is affirmed.[7]

---

BRIGHT, Senior Circuit Judge, dissenting.

I dissent.

Hayes, a black man charged with killing his former girlfriend, a black woman, and a white cab driver, received an appointed counsel who had never before tried a capital case, and whose experience in criminal law was limited to one prior complete trial, defense of a rape charge. In the penalty phase, counsel's efforts should be characterized as practically worthless and, without much doubt, ineffective assistance of counsel.

Hayes stands convicted of murder. Yet he should not be put to death by the State unless the killing was an aggravated crime, outweighing any mitigating circumstances. He possesses a prior felony conviction for second degree murder, and has been involved in several violent episodes throughout his life. However, the psychological reports disclose at least two specific miti-

---

**7.** We have considered, and find to be without merit, Hayes' contention that his statements to the police were involuntary and should have been suppressed.

gating circumstances:[1] (1) diminished capacity from intoxication; and (2) diminished capacity from mental disease or defect (paranoid ideation and mental retardation). Counsel offered absolutely no evidence of the mental defects at the penalty phase and only in passing ineffectively mentioned intoxication.[2]

Prior to trial, the prosecution offered Hayes the opportunity to accept a guilty plea and take life without parole. When brought before the court, Hayes would not admit guilt, and thus the tentative plea agreement collapsed. The prosecutor, perhaps unhappy by having to try the case, may have taken his revenge at trial—for little else could explain the overzealousness with which he approached his prosecutorial duty. In his closing statement, the prosecutor engaged in several improper arguments—addressing jury members by name, and urging individual jury members to put themselves in the shoes of the victim, thereby violating the basic strictures against Golden Rule argument. Equally egregious, the prosecutor went on to describe in gory detail the plight of the victims and the impact of their death on the families. And, in the face of such outrageous and prejudicial demagoguery, defense counsel sat by silently—like a bump on a log.

The contrast in this case could not be greater between a prosecutor's overzealous and unprincipled pursuit of the death penalty and defense counsel's passive response. The scenario, *in toto*, was such to deprive Hayes of a fundamentally fair trial.

I would reverse the district court's judgment denying Hayes' writ of habeas corpus and would remand with instructions to that court to enter judgment reducing Hayes' punishment to life imprisonment without parole, unless the State, within such reasonable time as the district court may fix, commences proceedings to retry the question of punishment. *See Woodard v. Sargent*, 806 F.2d 153, 158 (8th Cir.1986).

## I. Failure to Introduce Mitigating Evidence

The majority, in determining counsel's performance consonant with the mandates of the sixth amendment, does not adequately consider the unique character of the penalty phase in a capital case, and the important role mitigating evidence plays in that phase. The Supreme Court has recognized time and time again that the death penalty is qualitatively different from any other sentence, *see, e.g., Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978), and has emphasized the need for "individualized consideration of mitigating factors" in capital cases. *Id.* at 606, 98 S.Ct. at 2965. In *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed. 2d 1 (1982), the Court observed that a system of capital punishment must be "humane and sensible to the uniqueness of the individual" and held that " 'the sentencer ... not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.' " *Id.* at 110, 102 S.Ct. at 874 (emphasis in original) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 953 (1978)). Similarly, in *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1988), the Court vacated petitioner's death sentence because the jury was precluded from considering evidence that the defendant would not pose a danger to society if spared. *Id.* at 8, 106 S.Ct. at 1673. The American Bar Association's *Standards for Criminal Justice* mirror the Supreme Court's concerns. The *Standards* hold that:

> The lawyer has a substantial and important role to perform in raising mitigating factors both to the prosecutor ini-

---

1. As mentioned in the majority opinion, mitigating circumstances include:

    (3) the capital murder was committed while the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, intoxication, or drug abuse [....]

    Ark.Stat.Ann. § 41–1304(3) (repealed 1977).

2. We reproduce counsel's weak argument on mitigation as an appendix to this dissent.

tially and to the Court at sentencing. This cannot effectively be done on the basis of broad emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense. Investigation is essential to the fulfillment of these functions.

*Standards for Criminal Justice* § 4–4.1 commentary at 4–55 (1980).

Further, section 5.2(b) of the American Bar Association *Standards Relating to the Defense Function* provides, "[t]he decisions on * * * what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with his client." *Standards Relating to the Defense Function* § 5.2(b), *cited with approval in Marzullo v. Maryland,* 561 F.2d 540, 547 (4th Cir.1977), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 394 (1978).

In *Woodard v. Sargent,* 806 F.2d 153 (8th Cir.1986), this court noted, "[t]he whole question of the death penalty depends, under Arkansas law, on the jury's discretion in weighing aggravating against mitigating circumstances." *Id.* at 157. In the instant case, this balancing act contemplated by Arkansas law never took place. Counsel's failure to introduce existing mitigating evidence prevented the jury from tempering the State's presentation of aggravating evidence with an individualized determination of Hayes' character and situation. *Woodard,* a case involving counsel's failure to present evidence of a mitigating circumstance, teaches that the skewing of this balancing act fatally flaws a jury's sentencing determination. As in *Woodard,* the sentence in this case cannot stand.

The majority attempts to distinguish *Woodard* by noting that counsel in that case failed to ensure that the checklist of aggravating and mitigating circumstances submitted to the jury included a pertinent mitigating circumstance, while in the case at bar the checklist submitted to the jury included all mitigating circumstances applicable to Hayes. This reading of *Woodard,* however, ignores an attorney's primary role at trial, the task which renders him invaluable to the client. To render assistance which can, in any meaningful way, be termed effective, an attorney must do more than just make an appearance in court. The attorney must be an advocate in support of his client's position. His/her role consists not just in making the jury aware of the relevant law, but in persuading the jury that that law militates in his/her client's favor. The *Woodard* court was concerned not only with the omission of the statutory mitigating circumstance in the checklist submitted to the jury, but also with the obvious strategical flaw such an omission entails.[3]

*Woodard* nowhere suggests that a submission of a complete list of existing mitigating circumstances to the jury in the language of the statute, as was done here, constitutes effective assistance, without more. The delivery of an instruction containing a bare list of mitigating circumstances, absent any supporting evidence or argument illustrating their relevance to petitioner, is tantamount to no assistance at all. The jury's abstract knowledge that evidence of "extreme mental or emotional disturbance," "mental disease or defect," "intoxication or drug abuse," weighs in the petitioner's favor is irrelevant if the jury is not shown that such evidence exists in Hayes' case.

The majority suggests that counsel in this case did argue the applicability of one factor from the checklist—intoxication—by referring to testimony regarding Hayes' treatment for alcoholism given in the guilt phase of the trial. However, this reference to evidence adduced in the guilt phase can hardly be termed effective argument at the penalty phase. Hayes' alcoholism has dif-

---

**3.** The court stressed "[a] finding of a mitigating circumstance should have been an important objective in Woodard's case, and the failure to seek the inclusion of this obvious mitigating circumstance certainly fell below the threshhold of reasonably competent assistance." *Woodard v. Sargent,* 806 F.2d 153, 157 (8th Cir.1986).

ferent significance in the determination of his guilt and in the imposition of a sentence. Because Hayes' drinking did not negate the specific intent required for the crime does not mean that evidence of Hayes' struggles with alcoholism is not a potent mitigating factor at the penalty phase.[4] Even if counsel presented some material relating to Hayes' drinking problem at the guilt phase, this evidence should be again presented in the penalty phase where the standard of proof is lower, the rules of evidence less stringent, and the stakes immeasurably higher. *See Neal v. State,* 274 Ark. 217, 623 S.W.2d 191 (1981).

I must also take issue with the conclusion that defense counsel acted reasonably in failing to introduce into evidence medical and psychological reports documenting Hayes' alcohol addiction and anti-social behavior, particularly because that report indicates the applicability of a second mitigating circumstance—impairment as a result of mental disease or defect. Dr. Krulin's reports, which counsel failed to produce, documented not only a "history compatible with alcohol abuse," but diagnosed a "past history of trauma, episodes of amnesia and apparent paranoid ideation" and condition of "borderline mental retardation."

That the report also contained references to past violent episodes does not justify counsel's failure to present the information contained therein as mitigating evidence to the jury for two reasons. First, such references would not have greatly changed the image of Mr. Hayes implanted in the jury's mind throughout trial. Hayes had one day earlier been convicted of deliberately and with premeditation killing two individuals.

Further, the State in the penalty phase presented evidence of Hayes' prior conviction, thus hammering home to the jury Hayes' violent tendencies. Absent countervailing argument, the jury, after the State's presentation, could only be left with a portrait of Hayes as an unregenerate savage. At that juncture, the introduction of anything of mitigating nature, even if only historical or related to character, was crucial. Second, counsel could have called Dr. Krulin himself to the stand, or he could have made a *motion in limine* to keep out those matters which would be inadmissible. That counsel took neither of these routes is highly disturbing and for me serves to further illustrate that counsel served more as a bystander than an advocate.

The *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), *Darden v. Wainwright,* 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), and *Burger v. Kemp,* — U.S. —, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), line of cases relied on by the majority are inapposite. Counsel, in each of those cases, was concerned that the presentation of mitigating evidence would have opened the door for the state to present fresh damaging evidence previously unknown to the jury. In *Darden,* for example, the Court approved counsel's decision to rely solely on petitioner's plea for mercy, noting "[a]ny attempt to portray petitioner as a nonviolent man would have opened the door for the State to rebut with evidence of petitioner's prior convictions. This evidence had not previously been admitted in evidence, and trial counsel reasonably could have viewed it as particularly damaging." *Darden,* 477 U.S. at 186, 106 S.Ct. at 2474. Similarly, in *Burger,* the Court noted that counsel's decision not to have petitioner's mother testify, nor submit the affidavits of neighbors, made sense because both would have referred to petitioner's encounters with law enforcement authorities and previous conviction of at least one petty offense. The record as of the penalty phase was relatively unsullied, reflecting no criminal record nor legal entanglements whatsoever, save

---

**4.** Counsel's omission at the penalty phase must be viewed in conjunction with similar omissions at the guilt phase. Counsel failed to request an instruction dealing with the effect of voluntary intoxication as posing a jury question on Hayes' intent to commit murder. The district court held that trial counsel had been "marginally" ineffective in not seeking the instruction, but that there was no significant prejudice. While the giving of the instruction may not have changed the outcome on guilt or innocence, it very possibly may have been significant at the sentencing phase.

the single prior conviction presented by the prosecutor. Further, as the *Burger* majority observed, the neighbors' affidavits revealed defendant's violent tendencies, and thus conflicted with counsel's theory that defendant's crime was not the product of his personality but rather the result of an older dominating individual's influence. *Burger*, 107 S.Ct. at 3125.

In the case at bar, the available mitigating evidence neither permitted the State to introduce fresh evidence damaging to Hayes, nor thwarted defense counsel's diminished capacity defense. The jury already knew of Hayes' prior conviction, and thus were fully cognizant of Hayes' checkered record. Further, the report supported counsel's theory that Hayes, a long-time alcoholic, was intoxicated at the time of the murder.

Counsel's failure to call Hayes' sister to the stand is similarly suspect. The majority points out that Hayes had, prior to trial, indicated that he did not want family members testifying and reaffirmed that position when counsel attempted to call his sister to the stand in the penalty phase.

As previously noted, the penalty phase of a capital case differs greatly from the guilt-innocence portion of the trial. Hayes' waiver of the right to have his sister testify as to mitigating circumstances cannot be termed knowing, voluntary and deliberate, *see Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), because counsel never explained to Hayes the different standards and purpose of such evidence to be used at the sentencing phase. The possibility that Hayes was capable of a knowing, voluntary waiver appears even more remote when one considers Hayes' mental disabilities documented in the various psychiatric evaluations made of him. Moreover, the record nowhere indicates

that counsel made even the most preliminary investigation to determine if his client's fears as to his sister's testimony were well-founded. Such blind deference to a borderline retarded, alcoholic client, albeit a "difficult, demanding, authoritative" one,[5] does not constitute effective assistance of counsel. *See Clanton v. Blair*, 638 F.Supp. 1090 (E.D.Va.1986) (demanding client's refusal to succumb to psychiatric exam or to agree to counsel interviewing relatives and friends, does not negate a lawyer's duty to provide effective assistance of counsel), *aff'd in part, rev'd in part*, 826 F.2d 1354 (4th Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 762, 98 L.Ed.2d 779 (1988).

In short, "[t]here exists no indication in the record that [counsel] made any tactical decision; it appears much more likely that he abdicated all responsibility for defending his client in the sentencing phase." *Pickens v. Lockhart*, 714 F.2d 1455, 1467 (8th Cir.1983). Counsel's complete abdication cannot meet "the level of effective assistance required under the sixth amendment." *Id.*

## II. Inflammatory Remarks

The prosecutor's comments during both the guilt and penalty stages were patently improper.[6] Referring to the character of Hayes' victims while addressing the jury violates the most basic canons of legal argument.[7] Such references are grossly inflammatory and designed to activate the jury's emotions, while overrunning their rational thought. The same can be said of the prosecutor's references to the Bible, in which he quoted the verse "he that strikes a man and he dies shall surely be put to death." Such selective quoting from the Old Testament is not only incendiary, but misleading.[8]

---

**5.** *See* majority opinion, at 348.

**6.** The prosecutor advised the jury that they will serve as "voices" of the victims, reminded them that the victims would "never see another sunset," and admonished them to put themselves in the shoes both of the victim and her mother.

**7.** "'The prosecutor should not use arguments calculated to inflame the passions or prejudices

of the jury.'" *Standards for Criminal Justice, The Prosecution Function* § 3–5.8(c) (2d ed. 1980), *cited in Darden v. Wainwright*, 477 U.S. 168, 192, 106 S.Ct. 2464, 2478, 91 L.Ed.2d 144 (1986) (Blackmun, J., dissenting).

**8.** In fact, the Old Testament does not advocate the death penalty. Rather, ancient Jewish law abhors the death penalty and sets forth such a multitude of procedural barriers as to render

The majority correctly quotes *Darden* that the relevant inquiry is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden*, 477 U.S. at 181, 106 S.Ct. at 2472. Further, the majority notes that several factors which led the *Darden* court to deny defendants' habeas claim despite the prosecutors' remarks are present in the case at bar.[9] However, in *Darden*, defense counsel summed up before the prosecution, thus enabling defense counsel "to use the opportunity for rebuttal very effectively, turning much of the prosecutors' closing argument against them by placing many of the prosecutors' comments and actions in a light that was more likely to engender strong disapproval than result in inflamed passions against petitioner." *Id.* at 182, 106 S.Ct. at 2473. Hayes' counsel had no such opportunity to mitigate the damage inflicted by the prosecutor's closing remarks.

*Darden* is further inapposite because counsel in that case did not laud the victims and describe the suffering of their families. Since *Darden*, the Supreme Court has explicitly disallowed the admission of such material as irrelevant and inherently prejudicial. *See Booth v. Maryland*, — U.S. — —, 107 S.Ct. 2529, 96 L.Ed.2d 440, *reh'g denied*, — U.S. — —, 108 S.Ct. 31, 97 L.Ed.2d 820 (1987). *Booth* concerned a Maryland statute requiring the admission of a victim impact statement into evidence. The victim impact statement was devoted to a description of the emotional trauma suffered by the family and the personal characteristics of the victims. The Court stated:

> The focus of the VIS * * * is not on the defendant, but on the character and reputation of the victim and the effect on his family. These factors may be wholly unrelated to the blameworthiness of a particular defendant. As our cases have shown, the defendant often will not know the victim, and therefore will have no knowledge about the existence or characteristics of the victim's family. Moreover, defendants rarely select their victims based on whether the murder will have an effect on anyone other than the person murdered. Allowing the jury to rely on a VIS therefore could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill. This evidence thus could divert the jury's attention away from the defendant's background and record, and the circumstances of the crime.

*Booth*, 107 S.Ct. at 2534 (footnote omitted). The Court concluded that "any decision to impose the death penalty must 'be * * * based on reason rather than caprice or emotion.' The admission of these emotionally-charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decisionmaking we require in capital cases." *Id.* at 2536 (footnote & citation omitted).

The majority stresses that the prosecutors' remarks here were not sanctioned by the State, as was the victim impact statement in *Booth*. Nevertheless, the comments at issue inflamed the jury in the same manner as the victim impact statement in *Booth*. It is that impact on the jury which the Supreme Court held impermissible and violative of the eighth amendment.

While defense counsel's failure to object to the prosecutor's remarks, in and of itself, was not so egregious as to compromise the integrity of the trial, it served to further taint an already flawed proceeding. The prosecutor's offensive remarks, in conjunction with defense counsel's failure to present any mitigating evidence at the sentencing phase and to object to those remarks, "so undermined the proper func-

---

execution, in the words of Gerald Blidstein, "a virtual impossibility." *See* Blidstein, *Capital Punishment–The Classic Jewish Discussion*, 14 Judaism 159, 165 (1965).

**9.** These factors are: (1) there was no manipulation or misstatement of the evidence by the prosecution; (2) the statements did not implicate other specific rights of the accused; and (3) the jury was instructed that the opening and closing remarks were not to be considered as evidence. *Darden*, 477 U.S. at 181–82, 106 S.Ct. at 2472–73.

tioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). For the above reasons, I would grant Hayes' petition and set aside his death sentence in the manner set forth above. *See supra,* at 353.

### APPENDIX

[The defense counsel's argument on mitigating evidence reads:]

May it please the Court, ladies and gentlemen of the jury, you have made your decision with regard to whether or nor Mr. Hayes is guilty of capital felony murder, and Mr. Hayes will have to live with that particular decision. Now I would like for you to consider the evidence that was offered here today with regard to your finding that mitigating circumstances did exist with regard to the act which you have found Mr. Hayes to have committed.

The Court has instructed you that you are not required to be convinced of the existence of a mitigating circumstance beyond a reasonable doubt. A mitigating circumstance is shown if you believe from the evidence that it probably existed.

You heard the testimony from Dr. James. He testified that he saw Mr. Hayes on May 30, 1979, that he prescribed medication for Mr. Hayes with regard to treating Mr. Hayes for depression. You heard Dr. James state that Mr. Hayes came to him because he indicated that he was losing his girl friend and that he was also seeing the health of his mother deteriorate. Dr. James indicated that he prescribed medication and gave him enough medication for four weeks. He did indicate that he did give a refill on that particular medication and that Mr. Hayes was to come back on June 20, 1979, an appointment which Mr. Hayes did not keep.

Also you have heard testimony with regard to treatment for alcoholism, and I would ask that you consider this as a mitigating circumstance with regard to the commission of this particular crime.

On your verdict form we would like for you to consider and check the block on Form Two where it indicates that the capital murder was committed while T.J. Hayes was under extreme mental or emotional disturbance.

Also we would like for you to consider Number Three where it states that the capital murder was committed while the capacity of T.J. Hayes to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect, intoxication or drug abuse.

Tr. at 512–14.