**T.J. HAYES, Appellant,**

v.

**A.L. LOCKHART, Director, Arkansas Department of Corrections, Appellee.**

No. 86–1690.

United States Court of Appeals, Eighth Circuit.

Feb. 7, 1989.

As Amended Feb. 13 and Feb. 21, 1989.

Before LAY, Chief Judge, HEANEY, Senior Circuit Judge, and McMILLIAN, ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL and BEAM, Circuit Judges.

HEANEY,* Senior Circuit Judge, with whom LAY, Chief Judge, and McMILLIAN and ARNOLD, Circuit Judges, join, dissenting from the Court's decision not to grant appellant's motion to rehear this appeal en banc.

T.J. Hayes' right to counsel was violated by the appointment of an attorney whose efforts failed to satisfy minimum requirements of diligence and competence. A divided panel of this Court let stand the sentence of death. *Hayes v. Lockhart*, 852 F.2d 339 (8th Cir.1988). A petition for en banc review is now denied by virtue of another divided vote among the judges of this Circuit. I would grant the petition for en banc review and vacate Hayes' sentence primarily for the reasons eloquently set forth by Judge Bright in his dissenting panel opinion, and for the additional reasons outlined below.

FACTS

T.J. Hayes went to the local police on July 16, 1979, and told them that he thought he had just killed his girlfriend. Hayes led the police to the site of his acts. After receiving his *Miranda* warnings, Hayes made a statement to the officers.

Hayes told the police that he had been drinking since 8:00 that morning. At about 2:30 that day, he entered a cab with Catherine Carter, whom he had dated for several months. They were driven to the outskirts of town where they got out of the taxi.

Hayes was armed and told the driver to go back to town. The taxi driver, instead, charged Hayes, and Hayes killed him. Hayes and Carter then entered an abandoned dwelling nearby, where they proceeded to argue. She told Hayes that she was seeing someone else, and he killed her. Hayes left the scene in the cab, and by 4:15 he turned himself in to the police.

Prior to the crime, Hayes was receiving counseling. He was diagnosed as experiencing "severe insomnia and anorexia" caused by the illness of his mother and his breakup with his girlfriend. Progress Note, May 30, 1979 (Dr. James). He was suicidal but promised Dr. James not to hurt himself or anyone else until Dr. James could see him again. *Id.*

Shortly after criminal proceedings were commenced, Hayes underwent a series of court-ordered mental examinations. In a summary report, the doctors concluded that Hayes possessed the minimal mental abilities required to stand trial. Diagnostic Staff Conference Report, Jan. 3, 1980 (Summary Report). Intelligence tests, however, revealed that he was "within the borderline range of mental retardation." Psychological Evaluation 1, Oct. 5, 1979 (Drs. Simon and Gaffey). He has the verbal and mathematical abilities of an elementary school student. Psychological Evaluation, Dec. 19, 1979 (Drs. Mallory and Boyer).

The examinations also revealed long-term alcoholism extending back some twenty-five years. The effect of his drinking was to make him paranoid and to induce episodes of amnesia. Circuit Court Psychiatric Evaluation 3, Oct. 10, 1979 (Dr. Krulin). During the ten- to fifteen-year period prior to this incident, he experienced frequent blackouts, as well as visual hallucinations. Arkansas State Hospital Progress Notes 2, Dec. 12, 1979 (Dr. Rosendale, initial interview).

The Summary Report was submitted in a letter to the trial court. It stated: "1. Without Psychosis; 2. Alcohol Addiction;

---

* The HONORABLE GERALD W. HEANEY as- sumed senior status on January 1, 1989.

3. Antisocial Personality, Severe." An underlying evaluation more fully explained:

> Psychological testing indicates Mr. Hayes obtained a WAIS score placing him within the borderline range of mental retardation. He achieved low scores in all areas; specific difficulty was noted with verbal abstract concepts of sameness and the ability to analyze social situations. * * * He is likely to have trouble analyzing situations and may misinterpret others' intentions.

Psychological Evaluation by Drs. Simon and Gaffey, at 1.

Hayes was tried in 1981 and found guilty of capital murder. In a second stage of the proceedings held to determine the appropriate penalty, the jury was presented with aggravating and mitigating facts about Hayes. The jury sentenced Hayes to death. The Arkansas Supreme Court reversed the sentence and conviction because the trial court had refused to provide Hayes' attorney with the underlying reports and records from the court-ordered evaluations of Hayes. *Hayes v. State*, 274 Ark. 440, 625 S.W.2d 498 (1981). On retrial, Hayes was appointed new counsel. His new attorney did not present the evidence contained in the underlying reports to the jury. In the proceedings at issue here, Hayes was again convicted and sentenced to death. The jury considered Hayes' past crimes aggravating and indicated that no mitigating evidence was presented to them. *See Hayes v. State*, 278 Ark. 211, 645 S.W.2d 662, *cert. denied*, 464 U.S. 865, 104 S.Ct. 198, 78 L.Ed.2d 173 (1983) (affirmed); 280 Ark. 509, 660 S.W.2d 648 (1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1331, 79 L.Ed.2d 726 (1984) (petition for post-conviction relief denied). Hayes filed a petition for habeas corpus relief in the United States District Court for the Eastern District of Arkansas, alleging, in part, that he had been denied a fair trial because of the performance of his trial counsel. That court denied the motion at the conclusion of an evidentiary hearing. *Hayes v. Lockhart*, No. 86–1690 (March 18–19, 1986) (Habeas Transcript).

## DISCUSSION

Hayes' counsel was *manifestly* ineffective. After reviewing the transcripts of the trial, Judge Bright, in uncharacteristically frank language, concluded:

> In the penalty phase, counsel's efforts should be characterized as practically *worthless* and, without much doubt, ineffective assistance of counsel. * * * In the face of [the prosecutor's] outrageous and prejudicial demagoguery, defense counsel sat by silently—like a bump on a log.
>
> The contrast in this case could not be greater between a prosecutor's overzealous and unprincipled pursuit of the death penalty and defense counsel's passive response.

Specifically, Judge Bright found fault with counsel's failure to introduce any mitigating evidence of mental impairment and to rise in defense of his client when the prosecutor engaged in inflammatory conduct.

I agree that Hayes' counsel was ineffective for these reasons. Most importantly, counsel failed to present mitigating evidence at the penalty phase. Because the evidence of Hayes' guilt was overwhelming, the presentation of mitigating evidence was the only way counsel could have helped his client.

## I. ATTORNEY COMPETENCY

The test for ineffective assistance of counsel is whether counsel's performance was deficient and whether such deficiency caused prejudice sufficient to undermine confidence in the reliability of the result. *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984). Thus, counsel's performance must be more than ineffective; it must fall outside "the wide range of professionally competent assistance." *Id.* at 690, 104 S.Ct. at 2066. If we find that counsel's conduct was deficient, we then consider whether counsel's errors cumulatively "undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

The Supreme Court has approached this inquiry by attempting to separate "strategic" decisions from those that are unrea-

sonable and thus deficient. *Id.* at 687–89, 104 S.Ct. at 2064–65; *Burger v. Kemp*, 483 U.S. 776, ——, 107 S.Ct. 3114, 3123–24, 97 L.Ed.2d 638, 655–56 (1987); *Darden v. Wainwright*, 477 U.S. 168, 186–87, 106 S.Ct. 2464, 2775–76, 91 L.Ed.2d 144 (1986). In *Pickens v. Lockhart*, 714 F.2d 1455 (8th Cir.1983), we considered the role of adequate trial preparation in the making of strategic choices. We explained that our usual deference to counsel's decisions was predicated on our assumption that counsel prepared for trial. *Id.* at 1467. The Supreme Court has also distinguished between decisions made after investigation and those decisions made after an unreasonable failure to prepare for trial. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. Our consideration of this case should therefore begin with a review of counsel's preparation.

Hayes' counsel "had never before tried a capital case, [his] experience in criminal law was limited to one prior complete trial * * *." 852 F.2d at 352 (Bright, J., dissenting). Counsel was appointed four months before trial commenced. He prepared his case principally by reading the transcripts of the first trial. Habeas Transcript vol. 1, at 92, 94, 117, 151–52, 168. He also read the psychiatric reports and visited with his client three or four times for a period of perhaps five hours. *Id.* at 96–97. This time estimate includes talking with Hayes the morning of the trial. Moreover, much of that time was not related to trial preparation; counsel was simply present as Hayes spoke and visited with his relatives. *Id.* at 97, 151, 199–200. He never sat down with Hayes and discussed in any detail the possibilities for a defense, nor reviewed with Hayes what would happen at trial. *Id.* at 99, 106, 139, 168. He did not talk with any of the doctors involved until the morning of the trial. *Id.* at 117. He apparently did not request Hayes' medical records regarding six months of in-patient care some years before. *Id.* at 153. There are several problems with Hayes' counsel's preparation.

Initially, counsel erred by developing his focus from reading the transcript of the first trial. The verdict of the first trial was overturned because the state withheld evidence from Hayes' first attorney. Yet, counsel elected to follow the strategy of his predecessor by focusing on intoxication as a defense without making use of the additional evidence.

Second, counsel failed to interview the doctors who made the reports in determining whether their contents should be used. Failure to engage in pre-trial investigation can be deficient performance. *Pickens v. Lockhart*, 714 F.2d at 1460. Where, as here, the reports indicated that Hayes suffered from "paranoid ideation" and was "borderline retarded," failure to interview the doctors to discover additional knowledge or insights or to judge their use as witnesses was prejudicial.

> [S]tategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations in investigation. In other words *counsel has a duty to make reasonable investigations* or to make a reasonable decision that makes particular investigations unnecessary.

*Strickland*, 466 U.S. at 690–91, 104 S.Ct. at 2066 (emphasis added).

Third, this attorney failed to research existing law in preparing for trial. He elected not to offer the doctors' reports into evidence at the penalty phase because he was concerned about some of the statements Hayes made to the doctors that were not related to his condition or treatment. "This report came to me as a package, and I felt I could not delete portions of it without offering all of it." Habeas Transcript vol. 1, at 124. If counsel had done any research, he would have found that the unhelpful portions were excludable. *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981); Ark. Rules of Evid. 403.

Thus, while "strategic choices made after *thorough investigation of law and facts* relevant to plausible options are virtually unchallengeable," *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066 (emphasis added), where, as here, counsel failed to prepare

for trial by investigating the facts and law, we should not be so understanding of his serious mistakes.[1]

## II. PERFORMANCE AT TRIAL

Counsel made several errors during the guilt phase of the trial which affected the jury's judgment at the penalty stage.

### A. Introduction of the Summary Report

The attorneys jointly offered into evidence the Summary Report from the State Hospital. Trial Transcript vol. 2, at 423 (Exhibit 18). The report consisted of a one-page letter to the trial court regarding Hayes' competency for trial.

> Dear Judge Williams:
> This is to certify that this is a true and correct report of the findings in the above case as derived from the following: 1) Historical data from outside sources; 2) Medical history, physical and neurological examinations by the examining physician; 3) Laboratory and other physical studies; 4) Psychological assessment by staff psychologist; and 5) Psychiatric history and direct psychiatric examination by the examining psychiatrist.
> Diagnosis: 1. Without Psychosis 2. Alcohol Addiction 3. Antisocial Personality, Severe
> It is the opinion of the examining psychiatrist that T.J. Hayes is not mentally ill to the degree of legal irresponsibility at the time of this examination and probably was not at the time of the commission of the alleged offense.
> It is further the opinion of the examining psychiatrist that T.J. Hayes has the mental capacity to understand the proceedings against him and has the mental capacity to assist effectively in his own defense; and, that he was probably not suffering from mental disease or defect of such degree as to make him unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

Presumably, Hayes' counsel believed that the Summary Report would bolster the testimony that Hayes had a drinking problem. But Hayes' counsel did not explain to the jury why the report was offered, and he made no reference to it in his closing statement. What was the jury to make of this report?

The last two paragraphs of the report correspond to the legal standards for insanity and competency to stand trial. To the jury, however, these paragraphs might well have meant that there were no mitigating circumstances with respect to Hayes' competency. Hayes' counsel never explained to the jury that a person can be legally sane and yet less than fully culpable or blameworthy under the law. The introduction of this exhibit without accompanying analysis or explanation undercut all later attempts to argue that there were mitigating factors with respect to Hayes' punishment. Instead, the jury carried the impression that "Hayes is not mentally ill to the degree of legal irresponsibility...."

1. Counsel also did not confer before trial with the witnesses he did call. For example, he called to the stand Bessie Lancelin, the Director of Alcohol Treatment Services at Southeast Mental Health Center. He was attempting to bring out evidence with respect to Hayes' problems with alcohol. He asked her what Hayes' treatment entailed. She explained that their treatment of Hayes was in part determined by the fact that he was on parole and had been referred by his probation officer. *State v. Hayes*, No. CR–79–243, Transcript vol. 2, at 406 (May 1982) (Trial Transcript). Until this time, the jury was unaware that Hayes had a criminal past. Without missing a beat, counsel followed with a similar question. Again, the witness spoke of Hayes' parole. *Id.* After her testimony was complete,, the attorneys retired to the Judge's chambers. Hayes' counsel moved for a mistrial, exclaiming, "I guess I did solicit the answer." *Id.* at 411. The court denied the motion for that reason.

The prosecution would have been unable to admit such evidence. Ark.Rule of Evid. 404(b). The defense attorney gave the prosecution a gem it could never mine for itself. The prejudicial nature of such evidence is demonstrated by the fact that "[i]n most jurisdictions today, the circumstantial use of character [to prove guilt] is rejected...." Advisory Comm.Note to Federal Rule of Evidence 404. Given the overwhelming evidence pertaining to guilt, this by itself is not reversible error. Yet, it is another example of the lack of pre-trial preparation in this case.

## B. Failure to Request Jury Instruction on Intoxication

Hayes' counsel elected to focus on intoxication as a defense. He neglected, however, to request a jury instruction on the legal consequences of intoxication. Under Arkansas law at that time, voluntary intoxication was a defense to the forming of the specific intent required for the commission of some offenses. *Varnedare v. State,* 264 Ark. 596, 573 S.W.2d 57 (1978). Capital murder is a specific intent crime that requires premeditation and deliberation. Ark.Code Ann. § 5–10–101(a)(3).

With respect to the guilt determination, the district court concluded that counsel was "marginally ineffective in failing to request the *Varnedare* instruction ..." Habeas Transcript vol. 2, at 237. The district court concluded, however, that this was not prejudicial because the evidence of guilt was overwhelming. *Id.* at 238. I agree with Judge Bright's insight, however, that "[w]hile the giving of the instruction may not have changed the outcome on guilt or innocence, it very possibly may have been significant at the sentencing phase." 852 F.2d at 355, n. 4. This instruction would have let the jury know that Hayes' intoxication was legally significant in assessing his responsibility.

## C. Failure to Check Prosecutorial Abuses

### 1. Comments on Hayes' Decision Not to Testify

Hayes' counsel failed to object to the constant indirect comments on Hayes' decision not to testify. "What does he say happened?  * * * He never said—Ever—How did the purse get on top of the body if she just fell there? How did the pants get wrapped around her leg * * *?" Trial Transcript vol. 2, at 465. "What was he doing in those three to eight minutes? We don't know." *Id.* at 466.

The constitutional right not to testify is infringed when the state comments on the accused's decision not to take the stand. *Griffin v. California,* 380 U.S. 609, 610–11, 85 S.Ct. 1229, 1230–31, 14 L.Ed.2d 106 (1965) (where the prosecutor remarked:

"The defendant certainly knows whether Essie Mae had this beat up appearance * * *. He would know that. He would know how she got down the alley. He would know how the blood got on the bottom of the concrete steps. * * * She can't tell you her side of the story. The defendant won't."). Indirect comments on the defendant's decision not to testify are also impermissible. *United States v. Montgomery,* 819 F.2d 847 (8th Cir.1987).

Reversal of the guilt determination is appropriate unless, as here, the evidence of guilt is overwhelming. *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). The failure of counsel to object, however, is significant as evidence of his general incompetence. What stands out from this record is that Hayes' counsel did not know the law.

### 2. Victim Impact Statements

During his closing arguments, the prosecutor also impermissibly focused on the victims and the effect the victims' deaths had on their families.

"Yes, about 2:30, when they left, Catherine was wearing these jeans, but they were nice and clean because I washed them." Look at them now, ladies and gentlemen. Blood-stained, blood-soaked, burned and charred. And this lovely blouse; what did she say about it? "Oh, yes, that's Catherine's. I've washed it many, many times. I recognize it." Blood all over them. They were nice and clean, and she looked, oh, so pretty when she left that afternoon. My baby daughter, Catherine.

$$* \quad * \quad * \quad * \quad * \quad *$$

That was Mr. Lunsford's first day on the job. Brand new. First day on the job trying to support his family, and it ends so abruptly and horribly for him. First day on the job, and look what happens.

Catherine Carter, who spent three years at the Pine Bluff Nursing Home, helping people, caring about people, loving, supporting them. And she gets a better job and she moves up to help her mother and her father and her 14–year-

old son who is going to graduate from high school next year who doesn't have a mother now and hasn't had in two and a half years—almost three years. She gets that better job and been working there months, and look how it ends for her.

*Id.* at 455–57.

The prosecutor also made personal appeals to individual jurors, making specific references to the jurors' families.

Put yourself in her shoes. Put yourself in her shoes. Think about it when you get in that jury room. Think about it. Think about it, *Mrs. Scott.* You've got four children. *Mrs. Curry*—she now only has four children. Her baby daughter is gone. Think about it, *Mrs. Burns,* when you get back in the jury room the pain that she must have felt and the agony and the terror and the horror because she's got blood all over; * * *.

*Id.* at 480 (emphasis added).

Finally, the prosecutor returned to describing the crime from the victims' perspective. He speculated on the victims' thoughts, reiterating the effect on their families, and he compared the victims' families with the jurors' families.

Ladies and gentlemen, there were two shots, and you think how many heartbeats—How many heartbeats did she have left while she was—the blood—she was breathing blood. It was going down in her windpipe into her lungs. She was probably choking on it. And to stand there, naked, and alone and not knowing when the fatal blow was going to come.

\*   \*   \*   \*   \*   \*

Mr. Lunsford—First day on the job, and what happens to him? And Mrs. Carter—Trying to help her family and support a 14–year–old son. It's—Well, *Mrs. Sites,* you have two children about that age; one is going to graduate. Her child, Derrick, is going to graduate from high school next year. He hasn't had a mother in almost three years, and he's got to go through life knowing what happened to her. Because he knows. These two people. A man who was—Well, he was trying to protect himself,

and he fell to the ground and was shot a second time behind the head. Completely innocent on his first day on the job, and I'm sure he was looking forward to it. And this lady right there who once was a most beautiful young woman. You could almost see the horror in their eyes; their face.

*Id.* at 481–82 (emphasis added).

All of these comments were made in the prosecution's summation during the guilt phase of the trial. They certainly affected the jury's view of the appropriate sentence, however, because the sentencing proceedings took place the same day.

The standard for evaluating prosecutorial comments is whether the "comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright,* 477 U.S. at 181, 106 S.Ct. at 2472 (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). Neither case clearly guides lower courts on how this test may be applied in a uniform manner. *Darden* on its facts does indicate that the Court is willing to tolerate inflammatory prosecutorial summations where the prosecutor does not misstate the evidence, implicate the accused's right to remain silent, and where the defense is permitted the last word. *Id.* at 180–82, 106 S.Ct. at 2471–73.

The prosecutor's comments in this case infected the sentencing proceedings because they improperly directed the jury's attention to "the character and reputation of the victim and the effect on his family." *Booth v. Maryland,* 482 U.S. 496, 504, 107 S.Ct. 2529, 2534, 96 L.Ed.2d 440, 449, *reh'g denied,* —— U.S. ——, 108 S.Ct. 31, 97 L.Ed.2d 820 (1987). "[T]he formal presentation of this evidence by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant * * *." *Id.* 482 U.S. at 508, 107 S.Ct. at 2536, 96 L.Ed.2d at 452. In contrast to the factual setting of *Darden,* the prosecutor in this case commented on Hayes' decision not to testify. The prosecutor also had the first and last

statements at both parts of the proceedings. Applying the *Darden* standard to the penalty determination, I think *Booth* makes clear what kind of conduct can render the resulting decision a denial of due process. By focusing on the victims, the prosecutor was laying a blunt, obvious and impermissible foundation for his request for the death penalty. The prosecutor's statements independently violated Hayes' due process rights with respect to his sentence.

In addition, Hayes' counsel's performance during this entire time reflects further evidence of ineffective assistance. The only objection counsel made during closing argument was when the prosecutor provoked Hayes and then used Hayes' reaction to suggest that Hayes was dangerous.

> [PROSECUTOR]: * * * But she doesn't know when she's got her last heartbeat until this defendant walks over and he—
> MR. HAYES: Keep your finger out of my face.
> [PROSECUTOR]: Well, there's an example right there, a good example.
> [DEFENSE COUNSEL]: Your Honor, I object.

Trial Transcript vol. 2, at 480.

No ruling on the objection was ever made. When asked why he did not pursue it further, counsel replied, "I don't know why I didn't pursue it any further." Habeas Transcript vol. 1, at 92.

> Counsel was also asked why he did not object to the other statements the prosecutor made. He replied, "It may have gone past me or it may not have. I don't know." *Id.* Ultimately, counsel justified his passive posture as a trial tactic.

> Q. [E]xplain to the Court what process you went through in deciding whether or not to object. Just a little more information along that line.
> A. I can't really be specific. But it's just my opinion that when a lawyer is getting up and making an opening statement or a closing argument, that you run the risk of alienating a jury by making objections while the lawyer is speaking. Now to say specifically that this reg-

istered to me as being objectionable, I just don't remember at this point.

Habeas Transcript vol. 1, at 134–35.

There are three problems with counsel's reply. First, his excuse is too broad. Not appearing confrontational by not objecting would excuse any failure by an attorney, no matter how unreasonable and prejudicial. If we were to validate this too easily as trial strategy, any error counsel made, no matter how serious or incompetent, would be excusable. Counsel's excuse is thus too broad in the face of obvious prejudice. *Commonwealth v. Barren,* 273 Pa.Super. 492, 417 A.2d 1156, 1161 (1979) (ineffective assistance where the prosecutor's summation was improper and where defense counsel failed to object because he feared irritating the jury). Second, counsel obviously did not know what to object to. He was too inexperienced and unlearned in the law to know when the prosecutor was engaging in impermissible argument. *Commonwealth v. Evans,* 479 Pa. 100, 387 A.2d 854, 856 (1978) (ineffective assistance where counsel erroneously believed that prosecutor's remarks were not prejudicial). Third, counsel only offered this excuse with respect to objections made during the prosecutor's opening and closing statements. Even if accepted, this excuse does not explain his failures *throughout* the trial. It also does not explain why counsel did not approach the bench during the prosecutor's summation or in between the guilt and penalty phases to prevent further similar remarks.

Finally, counsel's errors from inexperience were probably compounded by his lack of enthusiasm for advocating his client's innocence. Before trial, counsel attempted to withdraw. Trial Transcript vol. 1, at 89–94. During his own statement to the jury, counsel remarked: "I'm going to be somewhat brief in my closing argument because I don't want to insult your intelligence. * * * I was appointed by the Court to represent Mr. Hayes, and I don't know whether he is guilty or innocent." Trial Transcript vol. 2, at 469–70.

Lost in this counsel's willingness to let the prosecution dominate the guilt phase of

the trial was the realization that the prosecution had already substantially commenced an impermissible case for the death penalty.

## III. THE PENALTY PROCEEDINGS

There are two problems with the penalty proceedings in this case. First, Hayes' counsel failed to introduce mitigating evidence which, under the Arkansas statutory scheme, the jury was required to consider closely. This was clear error. Second, the prosecutor repeated all of his tactics from the guilt phase, thus violating *Darden* and *Booth.*

### A. Mitigation

#### 1. Arkansas Procedure and the Jury's Findings

Arkansas allows the death penalty for certain heinous homicides. *See* Ark.Code Ann. § 5–10–101. The commission of any enumerated crime is only the beginning of the process. For in each case where the death penalty is available, at the penalty stage Arkansas juries are required to weigh all mitigating circumstances against all the aggravating circumstances in determining whether the death penalty is appropriate. *See* Ark.Code Ann. §§ 5–4–603, 5–4–604 and 5–4–605.

The jury's deliberations are guided by the forms the jury is required to complete and the court's instructions which explain those forms. Form 1 lists possible aggravating circumstances. If the jury unanimously finds that one of the aggravating circumstances exists, then they are required to consider any evidence of mitigating circumstances under Form 2. In this case, the jury found that Hayes had previously committed another dangerous felony. Trial Transcript vol. 2, at 525.

Form 2 provided examples of possible mitigating circumstances. For example, there were three mitigating possibilities with respect to the defendant's mental state.

1. ( ) The capital murder was committed while T.J. HAYES was under extreme mental or emotional disturbance.
2. ( ) The capital murder was committed while T.J. HAYES was acting under unusual pressures or influences or under the domination of another person.
3. ( ) The capital murder was committed while the capacity of T.J. HAYES to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect, intoxication or drug abuse.

The jury has four options with respect to each circumstance. First, the jury may unanimously find that a mitigating circumstance existed. Second, the jury may indicate that some of its members believed that a mitigating circumstance existed. Third, the jury may indicate that there was some evidence of mitigating circumstances that they unanimously disbelieved. Fourth, the jury may indicate that there was no evidence before them of any mitigating circumstances. In this case, the jury checked the fourth option—NO MITIGATION EVIDENCE.[2]

**2.** Form 2, in relevant part, provided:

FORM 2
MITIGATING CIRCUMSTANCES
A. ( ) We unanimously find that the following mitigating circumstances probably existed at the time of the murder: (Check the applicable circumstances and specify any additional ones.)
  1. ( ) The capital murder was committed while T.J. HAYES was under extreme mental or emotional disturbance.
  2. ( ) The capital murder was committed while T.J. HAYES was acting under unusual pressures or influences or under the domination of another person.
  3. ( ) The capital murder was committed while the capacity of T.J. HAYES to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired as a result of mental disease or defect, intoxication or drug abuse.
  4. ( ) The youth of T.J. HAYES at the time of the commission of the capital murder.
  5. ( ) The capital murder was committed by another person and T.J. HAYES was an accomplice and his participation relatively minor.
  6. ( ) T.J. HAYES has no significant history of prior criminal activity.

The jury gathers its conclusions on Forms 3 and 4. Form 3 requires that the jury unanimously agree to three things for a sentence of death to be passed.

    (A) ( ) One or more aggravating circumstances did exist beyond a reasonable doubt, at the time of the commission of the capital murder.

       \*    \*    \*    \*    \*    \*

    (B) ( ) The aggravating circumstances outweigh beyond a reasonable doubt any mitigating circumstances.

       \*    \*    \*    \*    \*    \*

    (C) ( ) The aggravating circumstances justify beyond a reasonable doubt a sentence of death.

If the jury fails to agree to these three statements, life imprisonment without possibility of parole is required. This jury found all three conditions satisfied and ordered Hayes executed. Trial Transcript vol. 2, at 529.

### 2. Counsel's Failures

It is apparent from the statutory scheme and the structure of Form 3, that, once an aggravating circumstance is found, the death penalty will be imposed unless there is mitigating evidence.[3] Thus, if aggravat-

ing circumstances are obviously present, the crucial task for defense counsel is to present mitigating evidence. Often, there is no other job for the defense attorney. *Laws v. Armontrout,* 863 F.2d 1377, 1385–86, (8th Cir.1988) (en banc) (whether failure to introduce mitigating evidence constitutes ineffective assistance depends on the facts of each case).

Hayes had prior felony convictions for dangerous acts which qualified as aggravating circumstances. In 1972, he was involved in a shooting. He pled guilty to second degree murder and to shooting with intent to kill or wound. He was paroled in 1978. Hayes' counsel did not attempt to contest this nor could he have. Obviously, an aggravating circumstance existed.

Everything that could possibly hurt Hayes—graphic pictures of his crime, a description of past crimes, the bloody clothes of the victims, the statements about the victims' families—had all been received by the jury. Under the circumstances of this case, therefore, the only help counsel could offer Hayes was to try and convince the jury that mitigating circumstances also existed. This, counsel utterly and inexcusably failed to do.[4]

---

    7. ( ) Other: Specify in writing. _____
_____

B. ( ) One or more members of the jury believed that the following mitigating circumstances probably existed, but the jury did not unanimously agree: \* \* \* [same circumstances] \* \* \*.

C. ( ) There was evidence of the following mitigating circumstances, but the jury unanimously agreed that they did not exist at the time of the murder: \* \* \* [same circumstances] \* \* \*.

D. (X) There was no evidence of any mitigating circumstance. (Check if applicable.)

Trial Transcript vol. 2, at 526–28.

**3.** An additional reason to hear this case en banc would be to consider whether Form 3 is misleading. A jury should be able to answer parts (A) and (B) affirmatively and nevertheless decide that the circumstances did not warrant an execution. The court, however, did not instruct the jury that this was possible. Juries may feel that an affirmative answer to (C) is required where there are aggravating circumstances and no mitigating circumstances, and after an intensive focus on aggravation and mitigation.

**4.** In this closing statement, counsel did draw the jury's attention to the testimony about Hayes' pre-crime counseling sessions. Counsel described Hayes' treatment as related to depression and indicated he was given medication for it. He said nothing further about Hayes' mental state. He did devote one sentence to asking that Hayes' alcoholism be considered a mitigating circumstance. Counsel also wanted to call Hayes' sister to the stand during the penalty phase, but Hayes would not let him. Trial Transcript vol. 2, at 503. There is no connection between Hayes' sister and the medical evidence.

Judging from the summation as a whole, counsel's strategy was to philosophically challenge capital punishment itself. He traced the history of the death penalty through the Roman and British Empires, attempting to impress upon the jury the notion of evolving standards of mercy in sentencing, and he paraphrased the poetry of "Don Juan" that no man is an island. Trial Transcript vol. 2, at 514–516. Counsel knew from the process of jury selection, however, that all of these jurors were willing to apply the death penalty. This approach, therefore, was inadequate. As the American Bar Association has recognized:

Counsel had at his disposal several reports and studies of Hayes' competence made at the State Hospital. In sum, the supervising doctor concluded that Hayes was minimally competent to stand trial. But the underlying investigations revealed that he was "borderline retarded," poorly educated, alcoholic, paranoid, given to hallucinations and amnesic. Moreover, psychological studies showed that Hayes had "specific difficulty * * * [with] the ability to analyze social situations. * * * He is likely to have trouble analyzing situations and may misinterpret others' intentions."

The admission of these facts into evidence would likely have caused one or more jurors to find that mitigating circumstances existed. This would be especially likely if this attorney had ever taken the time to explain to the jury that there is a difference between insanity and impaired capacity. Instead, the jury was left with the impression from the Summary Report that Hayes was competent enough to be fully punished—to accept legal responsibility— when in fact that report only indicated that he was competent to be tried. The net effect of counsel's selective use of evidence was to convince the jury that Hayes was not entitled to a finding of mitigating circumstances.

In addition, Hayes' counsel failed to distinguish between intoxication and alcoholism. He suggested that Hayes may have been drinking that day and he introduced the Summary Report that said Hayes was an alcoholic. The evidence that Hayes was intoxicated at the time of the crime was minimal. *Hayes v. Lockhart,* 852 F.2d at 345. Counsel should have explained to the jury that the mental effects of alcoholism, however, can continue even when someone is not intoxicated. Instead, Hayes' counsel indicated that Hayes was alcoholic but never explained how alcoholism might affect the mind. Arkansas requires a mental impairment for a mitigating circumstance to exist. Developing the testimony of the doctors was therefore vital in giving legal significance to the mitigation arguments and "strategy" Hayes' counsel did pursue.[5]

Counsel offered two explanations for not submitting the full medical reports. First, there were references to Hayes' past bad acts. Second, Hayes had told an exculpatory story lacking in credence to one of the doctors. Habeas Transcript vol. 1, at 124–25.

Counsel's excuses are unconvincing for several reasons. First, the prosecutor had already made the jury aware of Hayes' past. During his penalty argument, the prosecutor introduced certified copies of Hayes' past convictions. He even took the opportunity, without objection, to tell the jury that Hayes' second-degree conviction was originally charged as first degree murder. Trial Transcript vol. 2, at 501–02.

Second, counsel unreasonably failed to interview the doctors or to investigate the possibilities raised in the reports. During the habeas hearing, counsel was asked when he consulted with the doctors.

Q. Now, did you talk with his doctors from the State Hospital from his first visit? Mr. Hayes' visit there in 1979.

The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. This cannot effectively be done on the basis of broad general emotional appeals or on the strength of statements made to the lawyer by the defendant. Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself.
1 ABA Standards for Criminal Justice, Standard 4–4.1 commentary, at 4–55 (2d ed. 1980) (cited in Judge Bright's dissent, 852 F.2d at 353–54).

**5.** Hayes' counsel's sole statement at the penalty stage with respect to alcoholism was: "Also you

have heard testimony with regard to treatment for alcoholism, and I would ask that you consider this as a mitigating circumstance with regard to the commission of this particular crime." Trial Transcript vol. 2, at 513. Counsel's effort in this respect should be distinguished from *Laws v. Armontrout, supra,* where the defense counsel chose not to pursue certain strategies. Here, counsel failed to develop the evidence necessary to support the strategy he chose. For other differences, see *Laws v. Armontrout,* 863 F.2d at 1378–79, 1388–89, 1390, 1393 (attorney's qualifications, experience, familiarity with evidence, knowledge of the law, interviews with past jurors and the indications available as to the defendant's mental state).

A. I did not until the morning of the trial. But I had also read the transcripts of the previous trial and I had also read their reports.

Habeas Transcript vol. 1, at 117.

This answer is misleading. The doctors from the State Hospital never testified at the first trial. *State v. Hayes*, No. CR–79–243, vol. 3, at 664–72 (1981). This is the only explanation counsel offered the district court for not consulting with the doctors who wrote the underlying reports which were the subject of the first reversal. There is no evidence that it would have been too costly or too time consuming during the preceding four months to talk to the doctors. Hence, counsel's decision not to investigate does not have a reasonable basis. This clearly constitutes ineffective assistance. *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. *Compare Burger v. Kemp*, 483 U.S. at ——, 107 S.Ct. at 3125–26, 97 L.Ed.2d at 657 (counsel "did interview all potential [mitigation] witnesses who had been called to his attention"); *Darden v. Wainwright*, 477 U.S. at 185, 106 S.Ct. at 2474 (investigations conducted). The decision was prejudicial because it kept counsel from assessing the strength of Hayes' case on mitigation. *Thomas v. Lockhart*, 738 F.2d 304 (8th Cir.1984). This seriously undermines the reasonableness of counsel's decision to focus on intoxication as had the attorney in the previous trial. It also calls into question counsel's choice not to present any mitigating evidence at the penalty stage. Subsequent "strategic" decisions cannot be so characterized where counsel failed to prepare his case at the outset. *Brubaker v. Dickson*, 310 F.2d 30, 35, 38–39 (9th Cir.1962) (failure to investigate facts and controlling law); *People v. Corona*, 80 Cal.App.3d 684, 706, 145 Cal.Rptr. 894 (Cal.Ct.App.1978) (failure to follow up on medical reports).

Lastly, counsel failed to research the law and to realize that both parts of the reports he was concerned about could be excluded. His belief that he could not delete portions of the reports displays an ignorance of Arkansas law and federal law. Under Arkansas law, even relevant evidence can be excluded for prejudice, confusion or waste of time. Ark.Rules of Evid. 403. Moreover, the Supreme Court has clearly established that incriminating statements made to a psychiatrist are not admissible at the penalty stage. *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (court-ordered competency examination). There is no evidence that Hayes was given *Miranda* warnings at the State Hospital, *see id.* 451 U.S. at 469, 101 S.Ct. at 1876, *Miranda v. Arizona*, 384 U.S. 436, 477, 86 S.Ct. 1602, 1629, 16 L.Ed.2d 694 (1966); and Hayes was in custody when these examinations were conducted. Whatever differences between this case and *Estelle*, counsel could and should have moved for an order editing the harmful factual statements about this crime from the reports. When asked why he did not bring a motion in limine with regard to the reports, counsel answered, "This did not occur to me." Habeas Transcript vol. 1, at 126.

Counsel had those reports on his desk for four months. It was prejudicial error not to consider how the helpful portions might be admitted, and to not investigate the controlling evidentiary law. The so-called strategic decision not to offer the reports was based on an erroneous understanding of the law. There is no evidence that counsel even did any legal research on penalty evidence, despite the fact that he knew that he had never before tried a capital case. Thus, even if counsel's failure to investigate the facts further could be characterized as reasonable, he was nevertheless unable to exercise "professional judgment" with respect to the evidence. *Laws v. Armontrout, supra*, 863 F.2d at 1384–85.

Counsel's failures at the penalty phase were more egregious than those which motivated our reversal of the death sentence in *Woodard v. Sargent*, 806 F.2d 153 (8th Cir.1986). In *Woodard*, the Arkansas Criminal Code was amended shortly before trial to add an additional mitigating circumstance. Despite the fact that Woodard was entitled to have the new circumstance weighed in his favor, his attorney failed to request a corresponding jury instruction. The attorney was obviously unaware of existing law. As this Court explained:

The whole question of the death penalty depends, under Arkansas law, on the jury's discretion in weighing aggravating against mitigating circumstances. Here, the jury found two aggravating circumstances and no mitigating circumstances. A finding of a mitigating circumstance should have been an important objective in Woodard's case, and *the failure to seek the inclusion of this obvious mitigating circumstance certainly fell below the threshold of reasonably competent assistance.*

806 F.2d at 157 (emphasis added).

The majority opinion for the panel attempts to distinguish *Woodard* by arguing that in this case the jury instructions were proper, and that counsel here made a legitimate strategic decision not to introduce the reports. First, the fact that in *Woodard* there was no jury instruction is a meaningless distinction. The error in *Woodard* occurred because the attorney did not know the existing state of the law. For this reason, the panel's second distinction is also unconvincing. The reports might well have been admitted with the prejudicial matter excluded. Moreover, Hayes' attorney made no preparatory investigation in deciding whether to put this evidence before the jury. As a result, his decisions are entitled to less deference than the strategic decisions made by prepared counsel.

The panel's decision is thus also inconsistent with *Pickens v. Lockhart, supra.* In *Pickens,* the district court found that the defense attorney had elected as a matter of strategy not to present evidence of Pickens' background because a limited investigation suggested that the evidence would be mixed in nature. We reversed, writing:

> We cannot view the record to support such a conclusion. Given the severity of the potential sentence and the reality that the life of Plant's client was at stake, we find that it was *incumbent upon Pickens' counsel to offer mitigating proof.* There exists no indication in the record that Plant made any tactical decision; it appears much more likely

that he abdicated all responsibility for defending his client in the sentencing phase. We cannot view such an abdication as meeting the level of effective assistance required under the sixth amendment.

> The error of the district court in evaluating the strategy of Pickens' counsel is that it fails to consider that it is only *after* a full investigation of *all* the mitigating circumstances that counsel can make an informed, tactical decision about which information would be the most helpful to the client's case. In the present case, it is undisputed counsel failed to make *any* investigation whatsoever.

714 F.2d at 1467 (emphasis added). Judge Bright quite rightly relied on *Pickens* for his conclusion that counsel was ineffective in this case, and the majority made no reply.

The Arkansas scheme makes clear that so long as some aggravating circumstances are apparent, the defense should investigate mitigation evidence. Failing to prepare for trial, failing to even attempt to admit this evidence, and failing to analyze the evidence counsel did admit were all prejudicial errors, not strategic decisions.

### B. Prosecution Statements

The prosecutor's final comments during the penalty phase mirrored his remarks earlier that day in his guilt summation. The prosecutor again asked the jurors to view the case through the victims' eyes. He also drew on selective quotations from the Bible to suggest that the death penalty was the appropriate punishment.

> The defendant asked you for mercy. * * * Justice from our point of view, my point of view, Mr. Robinson's point of view, these people's point of view out here, your point of view, *and I guess God's point of view* because he told us in that twentieth chapter and twenty-first chapter in Exodus, "Thy shalt not murder." And the penalty for murder—I believe I wrote it down. In verse 12 of the twenty-first chapter, "He that strikes a man so that he dies shall surely be put

to death." And He went on to say two verses later: "If a man acts presumptuously toward his neighbor so as to kill him craftily, you are to take him from my altar so that he may die."

Trial Transcript vol. 2, at 524 (emphasis added).

These comments violated *Darden, supra*. The argument that "justice" from "God's point of view" required the death penalty for Hayes is especially inflammatory. The jury is required to apply the law of Arkansas and no other.

The panel majority dismissed Hayes' *Darden* claim because: "Our review of the record reveals that there was no manipulation or misstatement of the evidence by the prosecution, nor did the statements 'implicate other specific rights of the accused such as the right to counsel or the right to remain silent.'" 852 F.2d at 346–47 (quoting *Darden*, 477 U.S. at 182, 106 S.Ct. at 2472). I submit that the majority is wrong in its conclusion that Hayes' right to remain silent was not implicated. Moreover, the Court in *Darden* was also ultimately comforted because "[d]efense counsel were able to use the opportunity for rebuttal very effectively, turning much of the prosecutor's closing argument against them * * *. For these reasons [we affirm]." *Darden*, at 182–83, 106 S.Ct. at 2472–73. In this case, the prosecutor had the last word, permitting him to turn the defense counsel's discussion of God's mercy into an appeal for an execution to satisfy God. Finally, the majority's conclusion that there was no manipulation of the evidence is questionable.[6] Thus, two, if not all three,

of the factors important to the result in *Darden* point the other way in this case. Moreover, counsel's failure to object either in or out of the hearing of the jury or between the proceedings was ineffective assistance.

## IV. CONCLUSION

The reason why this attorney was in the courtroom that day was because the Arkansas Supreme Court had reversed the first conviction for the state's failure to provide the defense with the State Hospital reports. The court believed that the comments and observations contained in the doctors' first-hand reports, if presented to the jury, could change the outcome of the trial and sentence.

Here, it could be that an inspection and copying of these records and reports would have better enabled the appellant to prepare his defense, or interpose the defense of insanity, or present at trial *crucial evidence bearing on mitigation, such as possible mental retardation, during the sentencing phase of the trial*. We hold it was prejudicial error to deny him access to these agencies' reports.

*Hayes v. State*, 274 Ark. at 444, 625 S.W.2d at 500 (emphasis added).

I would set aside Hayes' sentence because his defense was seriously prejudiced by the incompetence of his counsel. Counsel twice introduced evidence that was very damaging to his own client. *See, supra* note 1 (Hayes on parole); discussion, *supra* section II–A (Summary Report). The most serious error was counsel's decision not to

---

**6.** The prosecutor suggested to the jury that Hayes had committed sexual crimes, as well. The prosecutor admitted and repeatedly displayed graphic pictures of the crime scene under the guise of scientific inquiry into the conditions of death and to establish the state of the victims as the police found them. *See e.g.*, Trial Transcript vol. 2, at 304–39 (Testimony of Officer Jonio, Dr. Hester and Dr. Malak). He used two of the photos again in his closing argument to show the jury "what happened." *Id.* at 480. Included in the photos the prosecutor used throughout was a picture of Catherine Carter, partially nude and spread-eagled on the floor; Exhibit No. 26. This photograph was largely redundant with Exhibit No. 24 from an eviden-

tiary standpoint. The only addition made by Exhibit No. 26 is the display of more nakedness and a perspective that emphasizes the female genitalia. This connects quite cleverly with the prosecutor's closing statement at the guilt phase.

She lived three to eight minutes before she was shot again. What was he doing in those three to eight minutes? We don't know.

We know from the physical evidence that she was still alive; that she was bleeding profusely because it got all over her clothes, and then from this other photograph here, part of her clothes were removed—Probably after the first shot * * *.

*Id.* at 466.

introduce mitigating evidence. Convincing the jury that mitigating factors existed was Hayes' only chance at avoiding the death penalty. Counsel's reasons for not using the medical reports are insufficient to justify his error.

While Hayes is certainly a dangerous and disturbed man, whether he should be put to death requires a review of the factors set forth in Arkansas law. In our system of justice, decisions such as these are to be the products of adversarial presentations of opposing viewpoints. This decision was not the product of reflection inspired by an adversarial marshalling of the evidence. The record in this case convincingly demonstrates that counsel failed to satisfy the minimum requirements of *Strickland.*

> That a person who happens to be a lawyer is present at trial alongside the accused, however, is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.
>
> For that reason, the Court has recognized that "the right to counsel is the right to the effective assistance of counsel."

466 U.S. at 685, 104 S.Ct. at 2063.

This sentencing proceeding was not adversarial. Accordingly, I dissent from the Court's decision not to review this case en banc.